IN THE UNITED STATES BANKRUPTCY COURT

FOR THE DISTRICT OF ARIZONA

| | |
|---|---|
| In re ERIK SAMUEL & DARYL LYNN DE JONG, | Chapter 11 |
| | Case No. 2:14-BK-00886-PS |
| | (Not for Publication- Electronic Docketing ONLY) |
| Debtors. | MEMORANDUM DECISION |

Before the Court is the proof of claim (Claim # 5-1) filed by JLE-04 Parker, LLC ("JLE"), the objection thereto (Dkt. 81) by Erik and Daryl de Jong (the "Debtors"), JLE's Application for Administrative Priority Claim (Dkt. 251), and the Debtors' objection thereto (Dkt. 265). The matters were consolidated for trial which the Court conducted over a four day period. At total of 9 witnesses testified, including 2 by way of the designation of transcripts of prior testimony. The Court has considered the pleadings filed by the parties, the testimony of the witnesses and the numerous exhibits admitted into evidence. This is a core proceeding pursuant to 28 U.S.C. § 157(b)(2)(B). This ruling constitutes the Courts findings of fact and conclusions of law in accordance with Bankruptcy Rule 7052.

## I. Facts

1. Prior to and during the bankruptcy case, the Debtors have operated a dairy farming business under the trade name Valkyrie Dairy.

2. Prior to February 28, 2012, Valkyrie Dairy operated at property leased from the estate of Hugo N. Van Vliet ('Van Vliet").

3. On February 27, 2012, the Debtors, as lessees, executed a Lease with Sonora Desert Dairy, LLC ("Sonora Desert") for real property identified in Exhibit A to the lease as (i) 19315 South Tuthill Road, Buckeye, Arizona ("Sonora Dairy I"), and (ii) nine residential housing units.

4. Prior to moving onto Sonora Dairy I, Erik de Jong was advised by Bob Lueck ("Lueck"), the principal of Sonora Desert, that Sonora Desert was a debtor in bankruptcy and that the lease would need to be approved before the Debtors could take occupancy on the property.

5. Contrary to Lueck's instruction, the Debtors moved 1649 cows onto the Sonora Dairy I property on February 28, 2012, and thereafter conducted a dairy farming operation.

6. The cows were moved onto the Sonora Dairy I property in 8.5 hours.

7. On March 1, 2012, the Debtors, as lessees, executed a second Lease with Sonora Desert and Lueck (the "March 1 Lease").

8. The March 1 Lease provides that Sonora Desert is the lessor of the real property identified on Exhibit A.

9. Exhibit A to the March 1 Lease identifies the leased property as the Sonora Dairy I property, located at 19315 South Tuthill Road, Buckeye, Arizona.

10. Lueck is also listed as a lessor under the March 1 Lease for the nine residential housing units.

11. The March 1 Lease provides for a 3 year lease of Sonora Dairy I with two additional 3 year options to extend.

12. The March 1 Lease provides for a monthly base rent of $30,000.00, plus taxes and other costs, for the Sonora Dairy I property.

13. Section 2.2 of the March 1 Lease provides that either party may terminate the lease by giving 180 days written notice of the election to terminate.

14. Section 16.1 of the March 1 Lease provides "All notices, demand or communications required or permitted to be given hereunder shall be in writing and shall be deemed to have been given when delivered, or mailed by first class registered or certified mail, postage prepaid, addressed to the respective parties at their address set forth below or such other address as is indicated by written notice to the other party."

15. The address listed for the Debtors in the March 1 Lease was 20646 West Elliot, Buckeye, AZ 85326.

16. Section 18.1 of the March 1 Lease provides the Debtors with a right of first refusal if Sonora Desert or Lueck sought to sell the leased property.

17. The lessors under the March 1 Lease sought court approval of the lease in the Sonora Desert bankruptcy case, case number 2:12-bk-00262-CGC.

18. Erik de Jong appeared and testified at the hearing to consider approval of the March 1 Lease.

19. During his testimony, Erik de Jong advised Judge Case that he knew he would need to leave the property if and when the time comes.

3

20. On May, 29, 2012, the Court in the Sonora Desert bankruptcy case approved the March 1 Lease as clarified, modified and amended in the order ("May 29 Order").

21. The May 29 Order was agreed to by Erik and Daryl de Jong, who signed the Order.

22. In pertinent part, the May 29 Order provides that the Debtors acknowledge that:

    a. The Sonora Desert Dairy, LLC, was marketing the Sonora Dairy I property for sale;

    b. The Dairy Lease [the March 1 Lease] is junior to the first priority Agstar's Deed of Trust and a Wells Fargo replacement lien; and,

    c. Agstar's Deed of Trust was in default and that the automatic stay of bankruptcy code section 362 was staying Agstar from exercising its power of sale over the leased property.

23. The May 29 Order clarified the March 1 Lease to provide that the Debtors' would pay the sum of $2,615.42 per month for real estate taxes on the Sonora Dairy I property and $921.46 on the nine residential housing units.

24. The May 29 Order further reduced to 3 business days the time period for the Debtors to exercise their right of first refusal in the event the leased property was sold.

25. The May 29 Order amended Section 18.1 of the March 1 Lease, the right of first refusal provision, to provide:

> Lessors may offer the Dairy Property for sale with the other real property owned by the Lessors and Lessee's right of first refusal shall apply to the entire property offered for sale. Lessee may not exercise a right of first refusal for just the Dairy Property [Sonora Dairy I] if the Dairy Property is under contract for sale with the other land owned by Lessors: rather Lessee's right of first refusal shall apply to the entire property which is the subject of the Original Offer [as defined in the Dairy Lease] which includes the Dairy Property.

4

26. In May 2013, Erik de Jong communicated with Brian Van Leeuwen regarding obtaining milk quotas and a lease of his dairy farm (the "Van Leeuwen Property").

27. Lueck, as representative for Sonora Desert, prepared a written notice of termination of the March 1 Lease (the "Notice of Termination").

28. The Notice of Termination is dated May 30, 2013 and purports to terminate the March 1 Lease effective November 30, 2013.

29. The Notice of Termination is addressed to Erik and Daryl Lynn DeJong and lists their address as 19315 S. Tuthill Rd., Buckeye, AZ 85326.

30. On May 31, 2013, Charles Havranek ("Havranek"), the real estate broker hired to help Sonora Desert sell the property, received a copy of the Notice of Termination from Lueck.

31. Also on May 31, 2013, Havranek spoke with Erik and Thomas de Jong and advised them that the March 1 Lease was going to be terminated.

32. Erik and Thomas de Jong were displeased to hear about the potential termination of the March 1 Lease.

33. Havranek sent a text message to Erik de Jong advising him that the Notice of Termination had been sent.

34. Between May 31 and June 21, Erik de Jong spoke with Philip May ("May"), the attorney for Sonora Desert, during which the parties discussed the Notice of Termination.

35. On June 21, 2013, May sent an email to Erik de Jong following up on their earlier conversation, referencing the Notice of Termination and offering to withdraw the Notice of Termination if Erik de Jong would terminate his right of first refusal.

36. May explained in his email that the right of first refusal could prevent an auction of the Sonora Dairy I property in which case the property would go to a trustee's sale which would terminate the March 1 Lease.

37. Erik de Jong forwarded May's email to Thomas de Jong.

38. On June 26, 2013 (June 26 Hearing), the Court in the Sonora Desert case held a hearing to consider a Motion to Restrict or Limit the de Jongs' right of first refusal ("Motion").

39. Erik de Jong appeared at the June 26 Hearing in opposition to the Motion and addressed Judge Haines, who had been assigned the Sonora Desert case.

40. Erik de Jong advised Judge Haines that he was willing to remove the right of first refusal if he could obtain an extension of the lease that could not be terminated.

41. Erik de Jong was very familiar with the terms of the March 1 Lease, knew that it could be terminated at the drop of a hat, knew that a bankruptcy sale was to occur in October and wanted protection to ensure that he could stay on the property after a sale.

42. During the June 26 Hearing, Daniel Garrison ("Garrison"), an attorney for one of the parties, advised the Court that the Notice of Termination had been sent a few weeks before the hearing and that even if not terminated, the March 1 Lease and the right of refusal would be extinguished upon completion of a trustee's sale of the Sonora Dairy I property.

43. After Garrison spoke, Judge Haines heard again from Erik de Jong and, ultimately, denied the Motion.

44. In September 2013, after a hay fire at the Sonora Dairy I property, Havranek advised Erik de Jong that a trustee's sale of the property was set for December.

6

45. On October 16, 2013, May mailed and emailed a letter to Erik de Jong reminding him of the termination of the March 1 Lease and the need to vacate the Sonora Dairy I property.

46. On December 6, 2013, JLE purchased the Sonora Dairy I property, as well as the Sonora Dairy II and III properties, at a trustee's sale for the sum of $6,936,264.02 ("Trustee's Sale").

47. The Trustee's Sale included the real property and fixtures used to operate dairy farms at the Sonora Dairies.

48. Erik, Thomas and Arie de Jong attended the Trustee's Sale but did not bid on the property.

49. The completion of the Trustee's Sale extinguished any right the Debtors had to occupy the Sonora Dairy property.

50. At the conclusion of the Trustee's Sale, Erik de Jong announced that he was reserving his right of first refusal on the property sold.

51. JLE paid for the purchase using all of the funds available to it from a 1031 exchange sale, a $1,000,000 loan from Ambien Dairy and loans from the families of Joseph Echeverria ("Echeverria") and Chad Odom ("Odom").

52. Echeverria and Odom, through various entities control the ownership interests in JLE.

53. In the week after the sale, Echeverria and Odom met with Erik de Jong to confirm that JLE did not want to enter into a lease with the Debtors and that they needed to vacate the Sonora Dairy I property.

54. The initial meeting was cordial and Erik de Jong was asked to make a proposal for a reasonable and rapid exit from the property.

55. Erik de Jong did not make a proposal to leave the property and on at least three more occasions he spoke with Echeverria and/or Odom regarding JLE's desires for the Debtors to leave the Sonora Dairy I property.

56. As the time went by, the conversations between Erik de Jong and Echeverria became more and more adversarial with Erik de Jong insisting that he did not have to leave the Property because of the March 1 Lease and his belief that no court would remove him from the Sonora Dairy I property.

57. Ultimately, JLE hired counsel and on December 20, 2013 counsel sent a letter to the Debtors advising them that the March 1 Lease was terminated as of November 30, 2013 and that the Trustee's Sale terminated any interest that the Debtors had in the Sonora Dairy I property ("December 20 Letter")

58. The December 20 Letter demanded that the Debtors leave the Sonora Dairy I property by Saturday, January 14, 2014 and advised the Debtors that they would be obligated for rent under the terminated March 1 Lease at the rate of $30,000.00 per month plus taxes and other charges.

59. On or about December 25, 2013, the Debtors used three tons of feed that belonged to JLE with a value of $240 per ton.

60. On January 3, 2014, Erik de Jong responded to the December 20 Letter by faxing JLE's counsel a copy of the February 27 Lease, a lease that he knew had never been approved, and asserting a right to remain on the Sonora Dairy I property.

61. On January 7, 2014, counsel for JLE sent a second demand letter to the Debtors that, first clarified that the reference to January 14 in the prior letter was a typographical error and

that JLE actually demanded the Debtors to vacate by January 4, 2014, and second demanding that the Debtors vacate the Sonora Dairy I property by January 8, 2014.

62. The Debtors did not vacate the Sonora Dairy I property and on January 9, 2014, JLE filed a complaint in the Maricopa County Superior Court seeking a forcible entry and detainer ("FED Action").

63. The Debtors sought and obtained a continuance of the initial hearing in the FED Action and the matter was set for a date on or after January 23, 2014.

64. Prior to the hearing in the FED Action, Thomas de Jong made a proposal to JLE offering to sell the Debtors' cows and feed.

65. JLE declined the proposal.

66. Prior to, and after, filing the Debtors' bankruptcy petition, Erik de Jong was worried about the loss of the value of the Debtors' silage, which would be worthless if the Debtors were forced to move.

67. To preserve the value of the silage, Erik de Jong identified three potential exit plans and settlement proposals: (i) Sell all feed silage and other feed inventory to JLE and auction the cattle by the end of February; (ii) feed the silage and other feed inventory to his cattle and, when exhausted, auction the cattle – likely to at least the end of July; or, (iii) move to another dairy, if he could find an affordable dairy, after selling or using the silage and feed inventory.

68. Prior to January 21, 2014, Reed Haddock ("Haddock") on behalf of the Debtors presented an exit plan settlement proposal to JLE.

69. On January 21, 2014, noting that JLE had not responded to his proposal, Haddock advised Erik and Thomas de Jong that there was a good chance that JLE would prevail in getting a restitution order at the hearing in the FED Action.

70. On January 23, 2014, the Debtors filed their petition for relief under Chapter 11 of the bankruptcy code.

71. The bankruptcy filing stayed the FED Action.

72. At the time of the bankruptcy filing, the Debtors owned or leased approximately 3538 cows.

73. At the time of the bankruptcy filing, the Debtors' cows were worth $2,178.85 per head.

74. After the bankruptcy filing, Erik de Jong sought advice from his counsel and father in an email asking "I need to know the chances that the court would allow my equity to evaporate, then I can give you a better answer as to what I would do in such a situation and I decide if I am willing to assume the risks involved in such 'gamble.'"

75. In the first month of the bankruptcy, Erik de Jong's objective was to stay on the property until at least June 1.

76. Erik de Jong believed the even a June 1 move would cost the Debtors $400,000.00.

77. On March 26, 2014, Erik de Jong sent a text message to Ian Accomazzo ("Accomazzo"), the principal of JLE's purchaser for Sonoran Dairy I, indicating that he got exactly what he wanted from the bankruptcy court and that he was making a sh**tload of money off his cows.

78. The Debtors' monthly operating reports filed in their bankruptcy case show monthly income of:

    a.   Jan 23 through February 28, 2014    $1,191,640.10

b. March 2014      $1,241,742.14

c. April 2014      $1,243,914.61

d. May 2014      $3,587,151.95

e. June 2014      $  560,640.02

79. The May figures include $2,587,412.50 in net sales revenue from the May 21, 2014 sale of 1405 dairy cows for $1,938.94 each, before commission.

80. The Debtors 2013 year-end financial statement shows net income for the year of $712,684.00.

81. Debtors' accountant-prepared draft financial statement for the quarter ending March 31, 2014 shows net income of $1,365,885.00.

82. Debtors' accountant-prepared draft financial statement for the six months ending June 30, 2014 shows net income of $2,762,587.00; $1,711,752.00 excluding the sale of dairy cows.

83. Debtors used $1,478,042 in silage from January 1, 2014 through June 30, 2014.

84. The Debtors' milk sales for the six months ending June 30, 2014 were $9,302,594.00.

85. The Debtors' post-petition milk sales from January 23, 2014 through May 31, 2014 totaled $8,021,906.68; 86.23% of the milk sales for the first six months of 2014.

86. The Debtors' June 2014 milk sales totaled $878,610.70, 9.44% of the milk sales for the first six months of 2014.

87. The Debtors' milk sales from January 1, 2014 through January 22, 2014 total $402,076.62; 4.33% of the milk sales for the first six months of 2014.

11

88. In April and May 2014, the Debtors moved approximately 2000 cows to the Van Leeuwen Property.

89. The Debtors moved all of their cows (owned, leased or sold) by May 31, 2014 and were no longer operating on the Sonora Dairy I property.

90. By agreement of the parties, JLE is not asserting any rent claim after May 31, 2014.

91. The Debtors paid JLE rent and taxes for December 2013 (pro-rated from December 6th) through May 2014.

92. By agreement of the parties, the Debtors were authorized to feed off their silage, which remained at Sonora Dairy I, from and after June 1, 2014.

93. At the time the Debtors moved to the Van Leeuwen Property, the property was being leased by Arie de Jong.

94. On February 5, 2014, JLE agreed to sell Sonora Dairy I, the land and fixtures necessary to operate a dairy, to G&K Land and Cattle, LLC for $2,228,006.12.

95. G&K Land and Cattle is an affiliate of Accomazzo and Ambien Dairy.

96. The sale to G&K Land and Cattle was in furtherance of an agreement between JLE and Accomazzo pursuant to which Ambien Dairy loaned $1,000,000 to JLE to help pay for the property purchased at the Trustee's Sale.

97. On September 29, 2014, the sale to G&K Land and Cattle closed, with G&K Land and Cattle getting a credit for the $1,000,000 previously loaned to JLE by Accomazzo.

98. Echeverria owns or controls the ownership interest in JD&L LLC Investments, LLC, which owns a 50% interest in Rio Loco Holdings, LLC.

99. Odom owns or controls the ownership of Chad Odom Investments, LLC, which owns a 50% interest in Rio Loco Holdings, LLC.

12

100. Rio Loco Holdings, LLC, owns 100% of JLE.

101. Echeverria is the manager of JLE.

102. Among other assets, Rio Loco Holdings, LLC, owns 100% of Rio Loco Dairy Farms, LLC.

103. Echeverria and Odom created a business plan for the property JLE purchased at the Trustee's Sale.

104. The business plan provided that Dairy I would be sold to an Accomazzo/Ambien Dairy related entity, which would operate a dairy on Dairy 2 for 90 days while it repaired and updated Dairy I.

105. Rio Loco Dairy Farms, LLC, would operate a dairy farm on Dairy III.

106. After the Accomazzo/Ambien Dairy related entity moved on to Dairy I, and after Echeverria and Odom repaired and updated Dairy II, Rio Loco Dairy Farms' dairy operation would move onto Dairy II, leaving Dairy III to be updated.

107. JLE as property owner leased Dairy II to the Accomazzo/Ambien Dairy entity for no rent through May 2014 and for $15,000.00 per month thereafter.

108. Echeverria and Odom were unable to implement their business plan when the Debtors would not vacate Dairy I.

109. JLE, as property owner, leased Dairy III to Rio Loco Dairy Farms for the sum of $50,000.00 per month.

## II. Analysis

### a. JLE'S Claims

On March 28, 2014, JLE filed a proof of claim asserting a clam, as of that date, in the amount of $8,863,250.00. After trial, JLE advised the Court that it is seeking judgment for the following:

1. Trespass

   a. Loss of use of land

      i. Lost opportunities = $97,500

      ii. Lost profits = $3,503,831

   b. Cost of restoration of land = $120,000, plus additional amounts after March 28, 2014

   c. Annoyance/discomfort of owner = $70,000, plus additional amounts after March 28, 2014

   d. Fair market rental value = $83,000 as of March 28, 2014

   e. Punitive Damages = TBD

   f. Disgorgement of de Jongs' profits

      i. Pre-petition $1,145,000

      ii. Post-petition $7,632,756

2. Waste/Conversion/Bailment

   a. Physical damage to property = $2,500

Although included in its original proof of claim, JLE is no longer pursuing claims for (i) damage to a hay barn, (ii) stall cleaning costs, or (iii) potential liability to the Arizona Department of Water Resources. As to JLE's claims for lost profits, JLE advised the Court that

the claim was brought as an alternative to the disgorgement claim. JLE agrees that it is not entitled to lost profits and disgorgement.

## 1. Trespass

On December 16, 2014, the Court granted JLE's motion for summary judgment in part, and ruled that as of the conclusion of the Trustee's Sale on December 6, 2013, the Debtors were liable to JLE for a pre-petition trespass. On September 17, 2015, the Court granted JLE's motion for summary judgment and ruled that the Debtors were liable to JLE for post-petition trespass. Accordingly, the Court must determine the appropriate damages for the Debtors' trespass on the Sonora Dairy I property.

Generally, damages should ensure that the injured party is fully compensated. *Dixon v. City of Phoenix*, 173 Ariz. 612, 620, 845 P.2d 1107, 1115 (Ct. App. 1992); *Blanton & Co. v. Transamerica Title Ins. Co.*, 24 Ariz.App 185, 189, 536 P.2d 1077, 1081 (Ct. App. 1975). For example, in a real property trespass case, the facts may dictate that the damages are the difference in the market value of the property before and after the injury (see, *Mikol v. Viahopoulos*, 86 Ariz. 93, 95, 340 P.2d 1000, 1001 (1959)), the cost of restoration (*Id.*), or the rental value of the property (see, A.R.S. 12-1259 and 12-1271(A)(2); see also, *Restatement (Third) of Restitution and Unjust Enrichment* § 51(2) (2011)). In an appropriate case, however, a trespasser's liability may exceed the use value of the property and, instead, be measured by the trespasser's benefit or profit from the trespass. *See, Restatement (Third) of Restitution and Unjust Enrichment* § 51(4) (2011) (noting that a conscious wrongdoer may be liable to disgorge net profits); see also, *Restatement (Second) of Torts* § 929 (providing, at comment c, that a landowner who has been a victim of trespass may be entitled to a "restitutionary measure of

damages" based upon "the value to the tortfeasor of what he obtained.").[1]  Trespass damages, even when imposed against a conscious trespasser, are not punitive and should reflect only the degree to which the intentional trespasser benefitted from the trespass.  *Restatement (Third) of Restitution and Unjust Enrichment* § 51(4) (2011)("The object of restitution in such cases is to eliminate profit from the wrongdoing while avoiding, so far as possible, the imposition of a penalty).

A person who obtains a benefit by an act of trespass or conversion is liable in restitution to the victim of the wrong.  *See, Restatement (Third) of Restitution and Unjust Enrichment* § 40 (2011).  The measure of the restitution depends on the blameworthiness of the defendant's conduct.  *See, Restatement (Third) of Restitution and Unjust Enrichment* § 40, Comment b. (2011)* (noting that when restitution takes the form of a money judgment, the measure of recovery depends on the blameworthiness of the defendant).  Where the trespass is conscious, the measure of damages is the benefit received by the trespasser.  *Id*.  Accordingly, to determine the damages for the Debtors' trespass, the Court must determine whether the Debtors' trespass was innocent or conscious.

### A.  Innocent or Conscious Trespass

The Restatement (Third) defines a "conscious wrongdoer" as the following:

[A] defendant who is enriched by misconduct and who acts

(a) with knowledge of the underlying wrong to the claimant, or

(b) despite a known risk that the conduct in question violates the rights of the claimant.

---

[1] Although the Restatement of Restitution makes clear that disgorgement of the tortfeasor 's benefit is an appropriate measure of damages for a conscious trespass, the parties have not provided any Arizona authority regarding the propriety or impropriety of benefit to tortfeasor damages.  In the absence of controlling law, Arizona courts follow the Restatements.  *Keck v. Jackson*, 122 Ariz. 114, 115, 593 P.2d 668, 669 (1979).  Accordingly, the Court believes that in an appropriate case Arizona courts would award benefit to tortfeasor damages.

*Restatement (Third) of Restitution and Unjust Enrichment § 51(3) (2011).*

The Debtors occupied and operated a dairy at the Sonora Dairy I property since February 28, 2012. The Debtors took occupancy of the Sonora Dairy I property despite Lueck telling Erik de Jong that the lease was not effective until approved by the bankruptcy court in the Sonora Desert bankruptcy case. Faced with potentially losing his right to occupy the Sonora Dairy I property, Erik de Jong testified before Judge Case and acknowledged his understanding of the lease and the possibility of eviction. He responded affirmatively to Judge Case when questioned about his obligation to vacate the property. Not only did the Debtors sign the March 1 Lease, they signed the Court's May 29, 2012 Order acknowledging the modification to and weakening of their right of first refusal. The Debtors further acknowledged that their leasehold rights and occupancy were junior to the claims that Agstar and Wells Fargo asserted against the Sonora Dairy I property. Moreover, the Debtors acknowledged that the Agstar obligation was in default and that only the Sonora Desert bankruptcy filing was staying Agstar's enforcement of its lien. The Debtors understood their rights under the March 1 Lease; Erik de Jong's understanding and dissatisfaction are evident from his consistent use of the term "Court Mandated Lease" to describe the March 1 Lease as approved by Judge Case. The Court is satisfied that the Debtors knew and understood the risks attendant to leasing the Sonora Dairy I property and fully understood their need to vacate if the lease was terminated or if a senior lienholder enforced its lien.

Those risks were realized in 2013 when the Sonora Desert bankruptcy estate and its affiliated bankruptcy estates were forced to try sell their properties, including the Sonora Dairy I property that the Debtors' occupied, prior to a foreclosure by their secured creditors – creditors that the Debtors acknowledged in the May 29, 2012 Order were senior to the Debtors' lease. To

that end, Lueck attempted to negotiate a modification of the March 1 Lease with Erik de Jong that would make a sale of the Sonora Dairy I property more likely. Rather than working with the parties in the Sonora Desert bankruptcy case and its affiliated bankruptcy cases on a strategy that would have at least preserved a 180 day occupancy after a consensual bankruptcy court approved sale, the Debtors' held strong to maintaining their right of first refusal for the property; a right that Judge Haines advised Erik de Jong had de minimus value. The Debtors turned a deaf ear to the arguments of the attorneys for Sonora Desert and its creditors that maintaining the Debtors' right of first refusal would diminish the possibility of a consensual sale and would increase the chance of a trustee's sale. Having been unable to convince Erik de Jong of the benefits of working with him to sell the dairy, on May 31, Lueck prepared the written Notice of Termination.

In addition to Erik de Jong's communications with Lueck, Erik de Jong was advised of the Notice of Termination and the pending Trustee's Sale in May and June 2013 from conversations with and messages from Havranek, a conversation and email from May, and from having sat through the hearing before Judge Haines and having heard the arguments of counsel. Erik de Jong knew of the dangerous gamble that he was making. For unknown reasons, he held strongly to a right of first refusal that he knew was valueless and put his head in the sand in an attempt to ignore the Notice of Termination of his lease; a Notice of which he admits he was aware. While the Debtors had the absolute right to enforce their rights under the March 1 Lease, they bare the risk for the losses that maintaining that right created – namely the Trustee's Sale of the Sonora Dairy I property and the extinguishment of the March 1 Lease and all of their rights thereunder.

The parties dispute whether the Notice of Termination was effective against the Debtors.

18

The March 1 Lease, in Section 2.2, provides that either party may terminate the lease by giving 180 days written notice of the election to terminate.  The March 1 Lease, in Section 16.1, also provides "All notices, demands or communications required or permitted to be given hereunder shall be in writing and shall be deemed to have been given when delivered, or mailed by first class registered or certified mail, postage prepaid, addressed to the respective parties at their address set forth below or such other address as is indicated by written notice to the other party."  Thus, to be effective, the Notice of Termination had to be in writing and the writing had to be delivered to the Debtors.  The Notice of Termination was in writing and was addressed to the Debtors at 19315 S. Tuthill Rd., Buckeye, AZ 85326, the address of the Debtors' dairy operation but not the notice address set forth in the March 1 Lease.  Although the March 1 Lease provides that delivery of written notice to terminate the lease was deemed effective if the Notice of Termination was mailed to the Debtors at  20646 West Elliot, Buckeye, AZ 85326, the lease did not provide mailing to the West Elliot address was the sole manner in which to deliver written notice of termination.  The question the Court must answer is whether written notice of termination of the March 1 Lease was delivered to the Debtors.

Since the Notice of Termination was not addressed to the West Elliot address, delivery of the Notice cannot be deemed to have occurred under the lease terms.  Moreover, no evidence was presented to the Court of the actual mailing of the Notice of Termination or of its service on the Debtors.[2]  Although Erik de Jong testified that he knew of Sonora Desert's intention to terminate the lease that knowledge came from what he was told by Havranek and May and what he learned at the hearing before Judge Haines.  The was no evidence that anyone delivered the

---

[2] Sonora Desert's attorney May sent an email to Erik de Jong on June 21, 2013, referencing the Notice of Termination, the upcoming termination of the lease and the lease's extinguishment at a trustee' sale.  That email cannot stand as the service of Sonora Desert's written election to terminate the lease as it did not provide the Debtors with the required 180 days notice of the purported November 30 termination date.

Notice of Termination or any other written notice of Sonora Desert's exercise of its right to terminate the March 1 Lease. On this record, and despite Erik de Jong's knowledge of the lessors' desire to terminate the lease, the Court cannot find that the written Notice of Termination was delivered to the Debtors or that it triggered the termination of the March 1 Lease.

The parties spent much trial time on the issue of whether the March 1 Lease was terminated on November 30, 2013. Whether the March 1 Lease was terminated on November 30 or six days later is not determinative on whether the Debtors were conscious trespassers as of December 6, 2013. Whether or not the Notice of Termination complied with the lease, the Debtors were aware of their and other parties' (Agstar's and Wells Fargo's) rights vis-a-vis Sonora Desert, they were aware of their lessor's decision to terminate the Debtors' lease rights, and they were aware that a trustee's sale would extinguish their leasehold rights. The Debtors were fully aware of all of those facts and the resulting upcoming loss of their legal right to operate on the Sonora Dairy I property. Instead of moving their dairy operation in the time allotted or working with the dairy owner to preserve their lease rights, the Debtors bet their dairy operation of the hyper-technical argument that they were not properly served with the Notice of Termination, a notice of which Erik de Jong unequivocally admitted he was aware. That bet ultimately failed when JLE purchased the Sonora Dairy I property at a Trustee's Sale that Erik de Jong attended.

Although the Debtors had been able to move 1649 cows onto the Sonora Dairy I property in 8.5 hours, they refused to move off JLE's property. If the Debtors thought more than a day was necessary to move their cows, they should have started the process sometime after learning of their lessors' decision to terminate the March 1 Lease; a decision necessitated by the Debtors' unwillingness to work with Sonora Desert to accomplish a consensual sale before the Trustee's

Sale.  The Debtors had that when they were aware in late May and early June 2013 that the lessor was terminating their lease.  They had that time after Erik de Jong spoke with and received an email from May offering to rescind the Notice of Termination and making clear that the Trustee's Sale would terminate the Debtors' lease rights.  They had that time after Erik de Jong spoke with Havranek in September about the hay fire.  Instead of making the reasonable decision to move the dairy or working with their lessor to accomplish a sale that would, at a minimum, extend the lease for 180 days after the sale, the Debtors chose to operate their business as usual.  The Debtors even decided to take delivery of silage in July and November, knowing their lessor was terminating the March 1 Lease and that a Trustee's Sale was upcoming; the likelihood of which was increased by the Debtors' insistence on maintaining a virtually valueless right of first refusal – that only applied to a consensual sale.

On this record the Court has no trouble finding that the Debtors knew that their right to remain in the Sonora Dairy I property was coming to an end – either by termination of the March 1 Lease or its extinguishment at the Trustee's Sale.  In either event, the Debtors knew they had to vacate the Sonora Dairy I property by, at the latest, the date of the Trustee's Sale.  The Court finds that JLE has established that the Debtors, particularly where Erik de Jong attended the Trustee's Sale, knew that JLE was the owner of the Sonora Dairy I property.  Moreover, based upon the email from May and the statements of counsel made to Judge Haines at the June 26, 2014 hearing that Erik de Jong attended and in which he participated, not to mention the conversations with Echeverria and the letters from JLE's counsel, the Debtors knew that the Trustee's Sale extinguished their rights in the March 1 Lease and their right to occupy the Sonora Dairy I property.  Despite that knowledge, the Debtors continued to operate their dairy at the Sonora Dairy I property until May 31, 2014.  The Court finds that the Debtors' trespass was

conscious from and after the December 6, 2013 Trustee's Sale until they vacated the Sonora

Dairy I property on May 31, 2014.

### B.     Trespass Damages

Unlike an innocent real estate trespass case where the damages are typically based up the

market value of the land trespassed upon, unless market value is higher, the value for restitution

purposes of a conscious wrongdoer is the net profit attributable to the underlying wrong.

*Restatement (Third) of Restitution and Unjust Enrichment § 51(4)* (2011).  The underlying policy

being that a conscious trespasser should not benefit from consciously occupying the property of

another.  *Restatement (Third) of Restitution and Unjust Enrichment § 40* (2011); *see also,*

*Restatement (Third) of Restitution and Unjust Enrichment § 3* (2011 )("A person is not permitted

to profit by his own wrong").  Having failed to vacate the Sonora Dairy I property in a timely

manner, the Debtors should not benefit from their continued post Trustee's Sale occupancy on

real property owned by JLE.

The issue for the Court to determine is what benefit did the Debtors receive from the

conscious trespass on JLE's property?  JLE believes that the benefit should be defined by the net

profit shown on the Debtors' monthly operating reports.  The Court does not believe that is the

appropriate measure for two main reasons.  First, the monthly operating reports generally report

only cash in and cash out transactions.  While the reports are a necessary tool for the Court and

creditors to assess a debtor's post-petition activities, they do not completely account for items

like inventory depletion and bulk sales like those that occurred in this case.  Second, simply

calculating net profit does not specifically answer the key question – what benefit did the

debtor/trespasser receive from the conscious trespass?  A trespasser could receive a benefit that

does not necessarily show in a monthly cash in cash out report.  Moreover, an income statement

(or monthly operating report statement of net income), does not take into effect profits that the debtor/trespasser could have earned had they not operated on the disposed owner's property. For these reasons the Court will not utilize the monthly operating report income as the profit for the damage analysis.

The main benefit the Debtors sought, and received, was to protect their investment in their silage. Erik de Jong was clear in his settlement offer and exit plans that the Debtors needed to protect the silage. That is not surprising given Erik de Jong's testimony that the silage was valueless if the Debtors had to move their operations. Although the Debtors did not move to the Van Leeuwen Property until April and May 2014, Erik de Jong could have moved immediately if he had access to the silage. The sale of the silage and cows was offered to, and rejected by, JLE. Protecting the silage was the key component in all three of Erik de Jong's proposed exit plans. The silage was essentially the equity that he wanted to protect when asking for advice so he could decide whether to take a gamble in the bankruptcy. When Erik de Jong advised his advisors that he needed time, the time he needed was the time necessary to feed off (use up) the silage. In fact, using the silage was so important to the Debtors that they would not consensually leave the Sonora Dairy I property until JLE agreed to allow them to leave and access (for no rent charge) their remaining silage on the Sonora Dairy I property.

The Debtors' June 30, 2014 accountant-prepared draft financial statement shows that the Debtors used $1,478,042 in silage from January 1, 2014 through June 30, 2014. Not all of the silage was used while the Debtors occupied the Sonora Dairy I property. By June 1, 2014, the Debtors had moved their dairy operations to the Van Leeuwen Property, where they operated a dairy with 1405 less cows than they milked on Sonora Dairy I property. The Court must determine how much of the silage was used while the Debtors occupied JLE's property. The

23

Court believes that the best way to determine that amount is to look to the Debtors' milk sales. Reviewing the milk sales allows the Court to account for the change in size of the Debtors' dairy operation when they moved from the Sonora Dairy I property to the Van Leeuwen Property.

The Debtors reported six month milk sales of $9,302,594.00 in the June 30, 2014 financial report. The June monthly operating report indicates that the Debtors' June milk sales were $878,610.70, or 9.44% of the milk sales during the six month period. Reducing the June milk sales from the total milk sales establishes that the Debtors milk sales from January 1 through May 31, 2014 were $8,423,983.30; 90.56% of the milk sales during the reporting period.

Multiplying the total silage used during the first six months of 2014 ($1,478,042) by the percentage of milk sold during the period the Debtors' occupied JLE's property (90.56%), establishes that $1,338,514.84 in silage was consumed in the 151 days Debtors' operated their dairy on JLE's property in 2014. On average, the Debtors used a total of $8,864.34 of silage per day from January 1, 2014 through May 31, 2014. Where the Debtors' milking cattle herd was consistent in size from December 2013 through May 2014, the Court finds it appropriate to utilize the same average daily silage calculation for the month of December 2013.

Multiplying the daily silage usage by 47 (the number of days of pre-petition trespass), establishes that the Debtors used $416,623.98 worth of silage during their pre-petition trespass. Multiplying the daily silage usage by 128 (the number of days of post-petition trespass), establishes that the Debtors used $1,134,635.52 worth of silage during their post-petition trespass.

Erik de Jongs' unequivocal testimony was that the silage would be worthless if the Debtors could not stay on the Sonora Dairy I property or access the property to feed off the silage. Upon the extinguishment of the March 1 Lease (by termination or Trustee's Sale) the

Debtors had no legal right to occupy or access the Sonora Dairy I property. Accordingly, the Court finds that the Debtors benefitted from the use of what would otherwise have been worthless silage in the pre-petition, post-December 6, use of $416,623.98 worth of silage, and in the post-petition use of $1,134,635.52 in silage.

The Debtors also benefited by being able to operate a larger dairy during the trespass period. While Erik de Jong testified he could not find a dairy property that the Debtors could afford to buy, he acknowledged that the Debtors could quickly move their dairy operation to the Van Leeuwen Property. The Debtors were not willing, however, to move their operation to the Van Leeuwen Property, or anywhere, without access to the silage. Ultimately, by May 31, 2014, and after using most of the silage, the Debtors moved their operation to the Van Leeuwen Property. Due to the size constraints at the Van Leeuwen Property, the Debtors' needed to liquidate some of their dairy cow herd. To that end, the Debtors sold 1405 dairy cows at a May 21, 2014, auction. The remainder of their herd was moved to the Van Leeuwen Property and used in the Debtors' continued dairy operations.

The Debtors directly benefited to the extent they profited from being able to use the 1405 cows that they could not use on the Van Leeuwen Property; their likely and eventual business home. Where the Debtors owned 3538 cows on the petition date, those 1405 cows made up 39.71% of their herd. Thus, 39.71% of the net profits generated by the Debtors dairy operations were a direct benefit from their trespass.

What were the Debtors' profits? Again, JLE asserts that the Court should determine the profits are based upon the information contained in the monthly operating reports. Again, the Court does not believe that the monthly operating reports contain a complete picture of the Debtors profits from their dairy operation. As pointed out by Erik de Jong, the reports do not

account for the cost of the silage used or depreciation. Additionally, the monthly operating reports include the amount received from the May 21, 2014 cattle auction as revenue and do not take into account the Debtors' basis in the cows sold. Instead, the Court believes that the accountant reviewed draft June 2014 financial statements reflect a more accurate description of the Debtors operations from January 1 through June 30, 2014.

The June 1 through June 30, 2014 financial statement indicates that after credits for all expenses, including credits for silage used and the Debtors' basis in assets sold, the Debtors' net income was $2,762,587.00. To determine the benefits received by the Debtors from their trespass, that profit figure must be reduced by the $1,050,835.00 in net income that the Debtors' received from the cattle sale; profit that did not result from the Debtors' operations on JLE's property.[3] Accordingly, the Debtors' net profit from dairy operations for the first six months of 2014 was $1,711,752.00.

In calculating the value of the silage used during the trespass, the Court created percentages based upon the Debtors' milk sales. Those percentages are equally applicable to determining the Debtors' net profits from dairy operations during the trespass period. Thus, multiplying the six month net profits from dairy operations of $1,711,752.00 by 90.56% (the January through May milk sale percentage) results in January through May net profits from dairy operations of $1,550,162.61. Taking the Debtors' dairy operations figure and dividing it by 151 (the number of day in January through May 2014) results in daily net profits from dairy operations of $10,262.98 from January 1 through May 31, 2014. Where the Debtors' milking cattle herd was consistent in size from December 2013 through May 2014, the Court finds it

---

[3] The $1,938.94 average price received by the Debtors' at the May 21, 2014 auction was less than the value of the cattle on the petition date (2,178.85). Accordingly, the Debtors did not receive a benefit from storing the 1405 cows on JLE's property.

appropriate to utilize the same average daily net profit calculation for the month of December 2013. Multiplying the daily net profits from dairy operations of $10,262.98 by 47 (the number of days of pre-petition trespass), establishes that the Debtors' net profits from dairy operations was $482,350.66 during their pre-petition trespass. Multiplying the daily net profits from dairy operations of $10,262.98 by 128 (the number of days of post-petition trespass), establishes that the Debtors' daily net profits from dairy operations was $1,313,635.84 during their post-petition trespass.

To calculate the benefit to the Debtors' from their trespass on JLE's property, the net pre-petition and post-petition trespass profits from dairy operations must be reduced to reflect the Debtors' net profits from dairy operations from the 1405 cows that the Debtors' could not utilize on the Van Leeuwen Property. Multiplying the Debtors' pre-petition net profits from dairy operations of $482,350.66 by the percentage of the herd sold at the May 21, 2014 auction (39.71%) establishes that pre-petition the Debtors earned $191,541.45 from cows that they could not have used in their operations had they not trespassed on JLE's property. Applying the same multiple to the Debtors' post-petition net profits from dairy operations of $1,313,635.84, establishes that the Debtors earned $521,644.79 from cows that they could not have used in their post-petition operations had they not trespassed on JLE's property.

Accordingly, the Court finds that the Debtors benefitted from the net profit they earned on the cows that they could not have used in their operations had they not trespassed on JLE's property during the pre-petition, post-December 6, period in the amount of $191,541.45, and during the post-petition period up to May 31, 2104, in the amount of $521,644.79.

## C. Conversion and Unjust Enrichment

JLE also asserts damages for the conversion of its personal property and for the Debtors' unjust enrichment from their operations during the trespass period.

### (i) Conversion

After the Trustee's Sale, the Debtors continued to use the real property and fixtures or personal property that had been leased to them under the March 1 Lease. Those assets were purchased by JLE at the Trustee's Sale. The Court's analysis of the Debtors' net profits included all of the real property and fixtures, or personal property, used by the Debtors and owned by JLE. Having accounted for their use in its trespass analysis, the Court believes that any additional damages would be duplicative. Accordingly, the Court will award no additional damages for the Debtors' asserted conversion of JLE's asserted personal property with one exception.

Both Erik de Jong and Echeverria testified that the Debtors used some of JLE's hay in the Debtors' business operations on or around Christmas 2013. While JLE asserted a value to the hay of $2,500.00, the valuation was not specific in terms of the amount of hay used or its value. In contrast, Erik de Jong testified that 3 tons of hay was used at a value of $240 per ton.

Based upon the Debtors' acknowledgement of the conversion of JLE's hay, the Court finds that JLE has a pre-petition claim in the amount of $720.00.

### (ii) Unjust Enrichment

In determining the amounts that the Debtors must disgorge for their conscious trespass, the Court determined the amount by which the Debtors' benefited from their trespass, and awarded the disgorgement of that amount. Having done so, there is no basis to award additional amounts to the extent JLE's unjust enrichment claim is in addition to, and not in the alternative of, its trespass/conversion claim.

28

### D. JLE's Lost Profits

As an alternative to disgorgement damages, JLE asserts a claim for lost profits for the Debtors' trespass. Damages are designed to insure that an injured party is fully compensated for any compensable loss. *Dixon v. City of Phoenix*, 173 Ariz. 612, 620, 845 P.2d 1107, 1115 (Ct. App. 1992). In an appropriate case, lost profits may be considered as part of actual damages. *Strawberry Water Co. v. Paulsen*, 220 Ariz. 401, 413, 207 P.3d 654, 666 (Ct. App. 2008) (citing *Hamil Am. Inc. v. GFI*, 193 F.3d 92, 108 n. 7 (2d Cir.1999) (stating that actual damages in a copyright case include lost profits); *ALLTEL Info. Servs., Inc. v. FDIC*, 194 F.3d 1036, 1040 (9th Cir.1999) (noting that lost profits are "indisputably actual damages").

JLE relies largely on the testimony and expert damages report of Greg Curry ("Curry") of Navigant Consulting for its assertion that it lost $3,503,831 in profits as a result of the Debtors' trespass. Navigant's report and Curry's testimony were of little assistance to the Court. The report and Curry's opinions are based upon an assumption that JLE was going to operate a dairy farm. The report is largely based on JLE's dairy operation on the Sonora Dairy III property. Curry acknowledged in his testimony, however, 32 instances where the report references JLE's assets and or operations, when the actual reference should have been to Rio Loco Dairy Farms, LLC, a separate entity owned by JLE's owner. The report never discloses Curry's fundamental assumption that JLE and Rio Loco Dairy Farms are interchangeable for his lost profit analysis. That missing disclosure is concerning, particularly in light of the fact that JLE was leasing Sonora Dairy III to Rio Loco Dairy Farms for $50,000.00 per month. Also concerning, was the

29

report's failure, as confirmed by Curry's testimony, to identify that JLE did not and had not operated a dairy, was not a member of the UDA and owned no cows.[4]

The Court understands that Echeverria and Odom created a business plan to purchase Sonora Dairy I, II and III at the Trustee's Sale and to utilize their various companies to develop and operate a dairy farming operation. JLE's role in that plan, however, was to be a land owner (it had funds available from an IRS § 1031 exchange to use to purchase real estate). JLE's role was further to sell Sonora Dairy I, which it did for the same price agreed to prior to the Trustee's Sale, and to lease the other dairies to Rio Loco Dairy Farms, which it did. As a landlord, JLE's claim is more appropriately for lost rents, if any, not lost profits.

### E. Other Damages

JLE also seeks the following: 1) Lost opportunities in the amount of $97,500; 2) Cost of Restoration in the amount of $120,000 as of March 28, 2014; 3) Annoyance/discomfort of property owner in the amount of $70,000 as of March 28, 2014; and (4) Fair market rental value in the amount of $83,000 as of March 28, 2014.

#### (i) Lost Opportunities

JLE's claim for lost opportunities relates to the asserted increase in the price of cows between during the Debtors' trespass; cows that JLE intended to purchase in its dairy operation. As noted above, JLE was and is a land owning entity not a dairy farming entity. Accordingly, the Court cannot find that JLE suffered any lost opportunity because of the asserted increase in

---

[4] Navigant's report regarding the Debtors' asserted pre-petition profits was equally problematic. The report, which was dated June 30, 2014, utilized estimates of the Debtors' business operations despite the then existence of accountant reviewed year-end financial statements and more recent actual sales and expense figures. The report also contained errors (the number of days to which it referred and average instead of actual milk price) that Curry admits resulted in 49% overstatement of his estimated profits. The errors were corrected in an updated report, created long after Curry's deposition and only one week prior to his testimony. With the exception of correcting the price of milk sold during the report period, the updated report did not attempt to replace any of the assumptions used with any actual revenue or expense figures. Like with his testimony regarding JLE's asserted lost profits, the Court found little assistance in Curry's estimate of pre-petition profits.

the cost of cows. Even if JLE was a dairy operation, JLE did not establish the price of cows at the time at the beginning of the Debtors' trespass. The Court notes that the evidence established that the price of cows at the time of the Debtors' bankruptcy filing was $2,178.85 per head, substantially higher than the $1,938.94 per head selling price for the Debtors' cows on May 21, 2014. On this record, JLE is not entitled to any award for lost opportunity costs relating to the increase in the price of cows.

The evidence further established that JLE was able to sell Sonoran Dairy I for the same price that it had agreed to with Accomazzo prior to the Trustee's Sale. The Court finds that JLE did not suffer any opportunity loss in connection with that sale transaction.

### (ii) Cost of Restoration

JLE seeks an award of $120,000.00 for the cost of restoration resulting from the Debtors' trespass. This claim is based on JLE's assertion that it had incurred or expended $120,000.00 in attorneys' fees as of March 28, 2014, in its effort to evict the Debtors from the Sonora Dairy I property. The claim for attorney's fees is unlike the traditional claims for damages to repair property that has been trespassed upon or converted. The Court need not, however, reach the issue of whether attorneys' fees are an appropriate cost of restoration in a trespass case. JLE provided no proof to support its alleged expenditure of legal fees. Without proof of the actual amount incurred or paid, the Court finds that JLE has not established its claim for cost of restoration.

### (iii) Annoyance/discomfort of Property Owner

JLE asserts the sum of $70,000.00 for annoyance and discomfort. The amount is based upon an undisclosed calculation of Echeverria's time expended dealing with obtaining possession of JLE's property, multiplied by a undisclosed billing rate. JLE presented no

31

evidence of its incurring of costs or expenses as a result of Echeverria's efforts in the litigation process. Further, JLE presented no evidence of the actual time expended by Echeverria or the rate used in its calculations. Accordingly, JLE failed to satisfy its evidentiary burden and the Court will award no damages for owner annoyance or discomfort.

### (iv) Fair Market Rent

The March 1 Lease provided for rent at the rate of $30,000.00 per month for the Sonora Dairy I property. JLE asserts that the appropriate monthly rent for the property was $58,500.00. JLE's estimate is based not on any industry data or expert testimony but upon Echeverria's testimony that the rental range for a dairy is $12 to $15 per hole (potential dairy cow) and multiplying the high end of that number by the 3900 holes at the Sonora Dairy I property. JLE's number is consistent with the rent it charged to Rio Loco Dairy Farms, a related entity, but inconsistent with the rent it charged Accomazzo's entity ($15,000.00 per month, under $5.00 per hole) and the amount it demanded in the December 20, 2013 demand letter. The Debtors indicated that the rental range is $10 to $15 per cow and that they are paying $10.75 per milking cow in rent for the Van Leeuwen Property.

During the time of the Debtors' trespass, the Debtors had approximately 3538 cows. Applying the rental rate the Debtors are paying to the number of cows that they had on the Sonora Dairy I property, establishes a monthly rental rate of $38,033.50 which the court finds is the fair market rental rate for the Sonora Dairy I property during the Debtors' trespass.

As ordered by the Court, the Debtors paid JLE $30,000.00 per month for January through May 2014. Erik de Jong further testified that the Debtors paid JLE for the pre-petition time that the Debtors occupied that property; an assertion Echeverria did not deny. JLE is therefore entitled to a rent claim for the $8,033.50 per month that the fair market rent exceeded the amount

32

paid by the Debtors. The pre-petition additional rent due by the Debtors is $12,180.05,

calculated as 47 days multiplied by the increased daily rent of $259.15. The post-petition

additional rent due by the Debtors is $34,466.35, calculated as 9 days in January multiplied by

the increased daily rent of $259.15, plus 4 months at $8,033.50.

## F. Punitive Damages

JLE also seeks punitive damages. Recently, the Arizona Court of Appeals reiterated the

standard for the application of punitive damages under Arizona law stating:

> Under Arizona common law, more than the "mere commission of a tort" is
> required to warrant recovery of punitive damages. *Rawlings v. Apodaca,*
> 151 Ariz. 149, 162 (1986) (quoting Keeton et al., *Prosser and Keeton on*
> *Torts* § 2, at 9–10 (5th ed.1984)). A plaintiff must also establish that the
> defendant's wrongful conduct was coupled with an "evil mind." *Linthicum*
> *v. Nationwide Life Ins. Co.,* 150 Ariz. 326, 332 (1986); *see also Rawlings,*
> 151 Ariz. at 162.
>
> …[A] defendant acts with an evil mind when it either intends to injure the
> plaintiff or "consciously pursue[s] a course of conduct knowing that it
> create[s] a substantial risk of significant harm to others." *Rawlings,* 151
> Ariz. at 162. When the wrongdoer is conscious of the harm posed by its
> tortious conduct, but continues to "act in the same manner in deliberate
> contravention to the rights of the victim," punitive damages are
> appropriate in order to both punish the wrongdoer and deter others from
> acting in the same manner. *Linthicum,* 150 Ariz. at 330.

*Newman v. Select Specialty Hosp.-Arizona, Inc.*, No. 1 CA-CV 13-0665, 2016 WL 1377634, at

*3 (Ariz. Ct. App. Apr. 7, 2016).

On the facts of this case, the Court cannot find that punitive damages are appropriate.

While the Debtors did consciously trespass on JLE's property, the Debtors' behavior was

designed primarily to protect their interest in their silage and their ability to conduct a dairy farm.

While certainly the trespass had the potential to injure JLE, there is no evidence that the Debtors'

trespass was motivated by a desire to cause injury or harm to JLE. Similarly, the Court cannot

33

find that the Debtors knew that they were creating a substantial risk of harm to JLE. In fact, the Debtors continued to pay rent to JLE at the rate in the March 1 Lease, to alleviate the potential harm to JLE for their use of its property.

While the Debtors may have been misguided, their conduct was not evil in nature. Accordingly, the Court denies JLE's request to impose punitive damages.

### G. Damages

The Debtors consciously trespassed on JLE's property by continuing to operate their dairy on the Sonora Dairy I property, property (real property, fixtures and/or personal property) that JLE purchased at a Trustee's Sale on December 6, 2013. The proper measure of damages in a conscious trespass is not limited to the rent or license value, but instead is measured by the benefit that the conscious trespasser received from the trespass.

The Debtors, who knew that their rights under the March 1 Lease were terminated or extinguished, took a self-described gamble to protect their equity in their assets. That gamble resulted in the Debtors being able to liquidate $1,551,259.50 of silage that would have been lost had they vacated the Sonoran Dairy I property once they lost their leasehold interest. Not only did the Debtors' actions get them the time that they so desperately wanted to use their silage, in Erik de Jong's own words they enabled the Debtors to make a "sh**tload" of money. That money included $713,186.24 in net profit that they could not have earned if they had moved, as they could have, to the Van Leeuwen Property at the time of the Trustee's Sale.

The Debtors' gamble has a cost. Conscious trespassers are not entitled to reap benefits resulting from their tortious conduct. Accordingly, the Court awards JLE disgorgement damages as follows:

34

| | |
|---|---|
| Pre-petition silage | $416,623.98 |
| Pre-petition profits | $191,541.45 |
| **Total pre-petition** | **$608,165.43** |
| Post-petition silage | $1,134,635.52 |
| Post-petition profits | $   521,644.79 |
| **Total post-petition** | **$1,656,280.31**[5] |

Although the Court found that the fair rental value of the Sonora Dairy I property exceeded the monthly rent the Debtors paid JLE, the increase in fair market rental rate does not increase JLE's claim. Any additional dollar of rent due to JLE would reduce the Debtors net income, the net income upon which the profit portion of the disgorgement damages is based. Thus, additional damages for unpaid rent would be duplicative of the damages already awarded.

JLE is also awarded the sum of $720.00, representing the value of the hay improperly used, pre-petition, by the Debtors.

Where the disgorgement damages exceed what would otherwise be the rent value of the trespassed property, the Debtors are entitled to a credit against the award for the rent paid. *See*, *Restatement (Third) of Restitution and Unjust Enrichment § 51(4) (2011)*(noting that the measure of damages is the higher of market value and profits attributable to the conscious act). Debtors paid JLE $30,000.00 in monthly rent and $2,615.42 in monthly taxes. The prorated amount of $26,302.76 paid by the Debtors for the December rent and taxes must be credited to reduce JLE's pre-petition claim. Similarly, $23,146.43 reflecting the pre-petition January rent and taxes paid to JLE must be credited to reduce JLE's pre-petition claims. Finally, the post-petition rent

---

[5] The post-petition claim is entitled to administrative priority. See, *In re Ybarra*, 424 F.3d 1018, 1025 n. 10 (9th Cir. 2005)(citing *Reading v. Brown*, 391 U.S. 471, 482, 485 (1968) and noting that post-petition tort claims are entitled to administrative expense priority).

35

and taxes of $139,930.67 that the Debtors paid to JLE must be credited to reduce JLE's post-petition claim.

### III. Conclusion

For the foregoing, the Court finds that JLE has a pre-petition claim in the amount of $558,716.24. The Court further finds that JLE has a post-petition claim, entitled to administrative priority pursuant to 11 U.S.C. §503(b), in the amount of $1,517,069.64.

The Court will issue a separate order consistent with this ruling.


SIGNED AND DATED ABOVE